## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, and MARY A. GOULET, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CIV-11-1043-D |
| GOODWILL INDUSTRIES OF SOUTHWEST OKLAHOMA AND NORTH TEXAS, INC., | ) ) ) | |
| Defendant. | ) | |

## ORDER

Before the Court are the parties' cross motions for summary judgment.  In its motion  [Doc. No. 58], the Equal Employment Opportunity Commission ("EEOC") argues it is entitled to partial judgment on the issue of liability on its claims of unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*.   The motion [Doc. No. 59] of Defendant Goodwill Industries of Southwest Oklahoma and North Texas, Inc. ("Goodwill") seeks judgment on all claims asserted by Plaintiff-Intervener Mary A. Goulet ("Goulet") and by the EEOC. After filing responses and replies, the parties sought leave to file supplemental briefs  addressing whether the decision in *University of Texas Southwest Medical Center v. Nassar,* 570 U.S. __, 133 S.Ct. 2517 (2013), impacts the retaliation claims in this case.  The Court granted their request, supplemental briefs were filed, and the motions are now at issue.

Background:

The EEOC brought this action against Goulet's former employer, Goodwill, alleging that Goodwill terminated Goulet's employment in retaliation for her exercise of rights protected by both Title VII and the ADEA.  Specifically, the EEOC contends that Goulet was terminated because she

offered deposition testimony in support of a former employee who sued Goodwill and asserted gender and age discrimination claims based on its failure to hire her as its Chief Executive Officer ("CEO").  *See Ford v. Goodwill*, Case No. CIV-09-578-M, United States District Court, Western District of Oklahoma ("Ford lawsuit").[1]

As intervener, Goulet joins in the EEOC's retaliation claims.  She also asserts additional claims, including claims of race, gender, and religious discrimination; sexual harassment based on a hostile work environment; age discrimination; conspiracy to retaliate against her in violation of 42 U.S.C. § 1985(2); and state law claims based on Oklahoma's Anti-Discrimination Act ("OADA"), negligence, and wrongful termination in violation of public policy.

Goodwill denies it retaliated or discriminated against Goulet, and argues the undisputed facts show that her termination was based on nondiscriminatory business reasons unrelated to her deposition testimony or to her race, gender or religion.  The EEOC argues that the  undisputed material facts compel the conclusion that it has established Goodwill's liability as a matter of law on the Title VII and ADEA retaliation claims.

Summary judgment standard:

Summary judgment shall be granted where the undisputed material facts establish that one party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A material fact is one which may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To avoid summary judgment, a nonmovant must present more than a "mere scintilla" of evidence; the evidence must

---

[1] Ford's claims were based on Goodwill's 2008 selection of Jimmy Crews as its CEO, a position for which she had applied. After his selection, Ford resigned her employment and sued Goodwill, asserting federal and state claims of gender and age discrimination. On June 1, 2010, the Honorable Vicki Miles-LaGrange granted Goodwill's motion for summary judgment on all claims asserted by Ford. *See* Order [Doc. No. 55], Case No. CIV-09-578-M.

be such that "a reasonable jury could return a verdict for the non-moving party." *Id.*   The facts in the record and reasonable inferences therefrom must be viewed in the light most favorable to the nonmoving party; however, the nonmovant must support its position with evidence outside the pleadings. *Swackhammer v. Sprint/United Mgmt. Co.,* 493 F.3d 1160, 1167 (10th Cir. 2007); Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 324.   Allegations, personal beliefs, or conclusory assertions do not entitle a nonmovant to favorable inferences, and are insufficient to avoid summary judgment. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003).

Where a defendant argues that the undisputed facts show the plaintiff cannot prove an essential element of a claim, the defendant is not required to disprove the claim, but must show "a lack of evidence...on an essential element"of the claim.   *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).   The nonmovant must then "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant;" such facts must be supported by affidavits, depositions, or specific exhibits incorporated therein.   *Id.* (quotations omitted).

"The purpose of a summary judgment motion is to assess whether a trial is necessary." *Berry v. T-Mobile USA, Inc.,* 490 F. 3d 1211, 1216 (10th Cir. 2007).   "In other words, there must be evidence on which the jury could reasonably find" in favor of the non-moving party. *Id.*

The record before the Court:

The following summary does not discuss each exhibit in the extensive record submitted by the three parties.   Instead, it encompasses the primary contentions of the parties with regard to the events preceding Goulet's termination.   Additional exhibits will be considered in connection with the specific claim to which they relate.

The parties do not dispute that Goulet, an African-American female, was employed by Goodwill in 1999, and was named director of its adult day care program in 2002. In 2004, she was also placed in charge of Goodwill's Youth Services program. In 2008, the interim CEO, Francy Ford, named Goulet Vice President of Adult Day Care and Youth Services.

In August of 2008, Jimmy Crews ("Crews"), a white male, was hired as Goodwill's CEO. Ford then resigned and filed a lawsuit in which she alleged that, by hiring him, Goodwill discriminated against her on the basis of her gender and age.

On March 19, 2010, Goulet gave deposition testimony in the Ford lawsuit, and Crews attended the deposition. Goulet testified that, on March 18, she had lunch with three other Goodwill senior staff members, Ken Smits ("Smits"), Rocky Goforth ("Goforth"), and Donnie Rowe ("Rowe"). Smits was Vice President of Career Development, Goforth was Chief Financial Officer and Vice President of Finance, and Rowe was a program supervisor under Smits's supervision. Goulet testified that, during the lunch, Smits, Goforth and Rowe said that Crews was a racist and a sexist. She also testified that Smits said Crews selected white males to replace employees who left Goodwill. Additionally, Goulet testified that, on another occasion, Goodwill's Vice President of Human Resources, Meredith Parkin, told her Crews believed Goulet tended to hire too many African American employees. She also testified that Parkin asked her not to tell Crews about this conversation. Goulet deposition in Ford lawsuit, Goodwill Ex. 2.

On June 16, 2010, Goulet's employment was terminated. The stated reason was "insubordination, unsubstantiated racial and sexist accusations against supervisor and peers, inappropriate conduct to and in front of subordinates, and undermining the authority of her supervisor." Employee Disciplinary Report, Goodwill Ex. 1. The termination notice lists incidents

4

underlying these reasons, including a written communication from Rowe expressing concern about Goulet's "improper comments" during a lunch engagement; Goulet's statement, in the presence of of a subordinate, Chris Dunham, that Crews was a sexist and a racist; Goulet's misrepresentation to Crews regarding whether she complied with Crews's request that she arrange for Dunham to obtain a commercial driver's license; Goulet's accusation that Smits, Goforth, and Parkin called Crews a racist and/or a sexist, which they denied; and a March 26, 2010 verbal reprimand involving Goulet's conduct toward another employee, Elizabeth Skulski, which was described as improper. Goodwill Ex. 1.

According to the disciplinary report, Goulet was aware of the severity of her actions, she knew the procedures for filing grievances or concerns, but she never reported any of her concerns to Human Resources, and instead made "unsubstantiated allegations to or in front of subordinates and peers." *Id.* The report concludes that "[h]er accusations against her supervisor and peers are detrimental to the organization," and her "inappropriate comments to and in front of subordinates (Chris Dunham, Elizabeth Skulski, and Donnie Rowe) can not be tolerated for the welfare of the organization." *Id.*

It is not disputed that Crews made the decision to terminate Goulet after conferring with Smits, Goforth, Parkin and Rowe and after considering other incidents involving Goulet.

According to Crews, he received an April 13, 2010 written communication from Donnie Rowe, in which Rowe reported Goulet's comments during a March 29, 2010 lunch meeting attended by Goulet, Smits, Goforth, and Rowe. Goodwill Ex. 4. According to Rowe, Goulet asked if the others had noticed that Crews was replacing female managers with white males. *Id.* When Smits responded that he thought Crews hired the best qualified applicants, Goulet said she seemed to be

the only one who noticed.  *Id.*

After receiving Rowe's statement, Crews contacted Goodwill's outside legal counsel and asked if it would be proper to investigate the statement.[2]  Counsel advised him to wait until the Ford lawsuit was concluded.  After judgment was granted to Goodwill on June 1, 2010, Crews began an investigation.  Crews dep., Goodwill Ex. 5, p. 120-121.

During this same time period, another Goodwill employee supervised by Goulet, Robert Zackery, met with Crews on or about June 8 to discuss some concerns regarding the interaction between his program and others supervised by Goulet.  During that meeting, he told Crews that Chris Dunham wanted to talk with Crews about other matters. Crews dep., p. 137, lines 1-14. Crews later met with Dunham, who reported Goulet's negative comments to him about Crews; Dunham also said that Dunham was present in 2008 when Goulet told a representative of Goodwill Industries International that Crews was a racist and a sexist.  Crews told Dunham to put his comments in writing, and Dunham did so in a June 15, 2010 statement.  Goodwill Ex. 8.  In his statement, Dunham also said that Goulet told him Crews wanted Dunham to obtain a commercial driver's license so he could drive Goodwill's bus; however, Goulet told Dunham that he should not do so because she could not compensate him.  *Id.*

On June 15, 2010, Crews met with Goulet, Smits, Goforth, Rowe and Parkin to discuss Goulet's allegation about Smits's March 18 lunch meeting comments, and her separate conversation with Parkin regarding hiring practices.  Crews asked Smits and Goforth if Smits had called Crews a racist and sexist during their lunch meeting, and each denied that he did so.  Parkin also denied that

---

[2]After attending Goulet's deposition in the Ford lawsuit, Crews had asked legal counsel if he should investigate her allegation that Smits had called him a racist and a sexist, and counsel advised him not to do so at that time.  Crews dep., Goodwill Ex. 5, p. 136.

she asked Goulet not to tell Crews that Parkin had talked with Goulet about hiring practices. In response to Crews's inquiry during the June 15 meeting, Goulet said all in attendance  had previously called Crews a racist and/or a sexist.  Each denied doing so.

Crews asked Smits, Goforth and Goulet to submit written statements addressing Goulet's allegations.  Each did so.  Goodwill Exs. 11-13.  Smits denied making the comments attributed to him by Goulet during the lunch meeting, and denied that he had ever called Crews a racist or a sexist.  He stated that Goulet had made the lunch meeting statement that Crews replaced female employees with white males.  Goodwill Ex. 11.  Goforth denied having heard the March 18 comments attributed to Smits by Goulet,  and also denied her June 15 accusation that Goforth had labeled Crews a racist and a sexist.  Goodwill Ex. 12.  Parkin responded to Goulet's allegation that Parkin told her Crews was concerned about the number of African American employees hired by Goulet and that Parkin told her not to tell Crews they had talked.  Parkin denied so instructing Goulet, and also denied Goulet's allegation that Parkin told her to record Goulet's conversations with Crews.  Goodwill Ex. 10.  Parkin also denied Goulet's June 15 accusation that Parkin had called Crews a racist and a sexist.  *Id.*  In a separate statement, Parkin denied that Goulet had previously complained to her that Smits and Rowe made racist remarks or that Goulet believed Crews was a racist and a sexist.  Goodwill Ex. 14.  Parkin also said Goulet did not tell her that Goulet had told a Goodwill Industries International representative that Goulet believed Crews was racist or sexist.  *Id.*

In her statement, Goulet again asserted that, during the March 18 lunch meeting, Smits said Crews was replacing female employees with white males. Goodwill Ex. 13.  She also said senior staff members often discussed the organization with their subordinates, but she did not identify the

7

topics of those discussions. *Id.* She admitted that, in November of 2008, she told the Goodwill Industries International representative that she regarded Crews as racist and sexist, and she had not made any formal complaint about him to Parkin or anyone else. She added that she should not have made the comment to the representative, and she acknowledged that she disregarded company policy by doing so. *Id.* She also expressed her belief that Crews has a "low regard" for female employees. *Id.*

In addition to the statements he solicited from the vice presidents attending the June 15 meeting, Crews reviewed the June 15 written communication from Chris Dunham. With regard to the commercial license issue, Crews viewed Goulet's purported comments to Dunham as directly contrary to her 2009 written communication to Crews, submitted as Goodwill Exhibit 6, in which she stated that both she and Dunham were pursuing licenses. Crews testified in his deposition that he regarded her instructions to Dunham as directly contrary to the representation she made to Crews. Crews dep., Goodwill Ex. 5, p. 207. In her statement, Goulet addressed the commercial license matter, and denied that she had discouraged Dunham from pursuing the license. Instead, she stated that she was concerned about the lack of funds to compensate him. *Id.*

After reviewing the statements of all individuals, Crews concluded that the statements made by Goulet were not corroborated and were unfounded. Crews dep., Goodwill Ex. 5, p. 235.

With respect to Goulet's March 26, 2010 verbal warning mentioned as an additional reason for Goulet's termination, the record reflects this involves a complaint by Elizabeth Skulski, who was career development program manager at that time. Goodwill Ex. 3. Skulski was also a volunteer mentor for Goodwill's GoodGuides Program. In early March of 2010, Skulski told Smits she wanted to resign as a mentor because of comments made by Goulet. *Id.* Although the comments

8

are not specified in Goodwill's Exhibit 3, Skulski explained them in her deposition.  *See* Skulski deposition excerpts, Goulet Ex. 22.  According to Skulski, Smits asked her to assist Goulet in recruiting additional participants for the adult daycare program because of Skulski's experience; he believed Skulski's assistance would lead to increased participation.  Skulski dep., Goulet Ex. 22, p. 53, lines 22-25.  Skulski assisted Goulet with the program.  In March, she expressed concern to Smits because Goulet asked her several times if Skulski was going to take over Goulet's job.  *Id.*, pp. 60-61.  Although Skulski reassured her that was not the case, Goulet made the same comment several times.  *Id.*  Skulski told Goulet she was concerned about these repeated comments and, on at least one occasion, Goulet said she was only joking.  *Id.* at p. 63, lines 14-16.  Skulski believed Goulet's expressed concern caused a strain in their working relationship.  Smits asked Skulski to send him a written explanation, and she did so.  Goulet Ex. 24.  This led to the March 26 verbal warning given to Goulet.

It is not disputed that Goulet was approximately 57 years old when she was terminated and that her immediate replacement as Vice President of Adult Day Care and Youth Services was Ken Smits, who was approximately 60 years old. Also undisputed is the fact that, in  2011, Elizabeth Skulski was named Vice President of Adult Day Care and Youth Services, and she was approximately 44 years old at the time.

Evidence in the record reflects that, prior to 2010, Goulet's work performance evaluations were satisfactory.  The evidence submitted by the parties does not reflect any written records of disciplinary action prior to 2010.

Application:

The Court will first consider Goodwill's motion as it applies to Goulet's Title VII claims of

9

race, gender, and religious discrimination, and sexual harassment based on a hostile work environment, along with her ADEA claim and her pendent state law claims.  The Court will separately address the cross-motions for summary judgment on the EEOC's Title VII and ADEA retaliation claims, in which Goulet joins.

Goulet's Title VII claims:

Goulet contends that she was  subjected to employment discrimination and termination on several Title VII bases.  Title VII claims are governed by the burden shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  According to that analysis,  Goulet must first present evidence sufficient to establish a *prima facie* case as to the elements of the claim on which she relies; if she does so, the burden shifts to Goodwill to come forward with a justifiable, nondiscriminatory business reason for the adverse action against her.  *Id.*  If Goodwill does so, then the burden shifts to Goulet to present evidence that Goodwill's stated nondiscriminatory reason is not worthy of belief and is a mere pretext for discrimination.  *Id.*

"Inherent in the allocation of Plaintiff's burden is evidence demonstrating a causal connection between the conduct for which Plaintiff seeks relief and her protected status under Title VII."  *Gooch v. Meadowbrook Healthcare Services of Florida, Inc.*, 1996 WL 67193, at *2 (10th Cir. Feb. 16, 1996) (unpublished) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Title VII claims of discriminatory discharge based on gender and race:

Pursuant to Title VII, it is unlawful for an employer to discharge any individual because of that individual's "race, color...sex, or national origin."  42 U. S. C. § 2000e-2(a)(1).  Section 1981 also prohibits a discriminatory discharge based on race, and the elements required to prove such a

claim are the same under Title VII and § 1981.[3]  *Carey v. City and County of Denver*, 534 F. 3d 1269, 1273 (10th Cir. 2008).

To establish a *prima facie* case of discriminatory discharge based on race or gender, Goulet must show that (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge.  *English v. Colorado Dept. of Corrections,* 248 F. 3d 1002, 1008 (10th Cir. 2001).  A plaintiff's *prima facie* burden in a discriminatory discharge claim is described as "light," as "only the most baseless of claims fails to satisfy it."  *Zamora v. Elite Logistics, Inc*., 478 F. 3d 1160, 1171 (10th Cir. 2007)*.*

Assuming that Goulet has established a *prima facie* case, her evidence is insufficient to create a material factual dispute regarding pretext.  According to her testimony, Goulet contends she was subject to gender discrimination by Crews because, when he first became CEO in 2008, he invited males to lunch or dinner, and did not invite her.  Goulet dep., Goodwill Ex. 7, p. 22, lines 4-24.   Despite Goulet's belief that, in 2008, she was not invited to lunch and dinner with other male senior employees, the record contains numerous references to lunch meetings attended by Goulet and the male vice presidents in 2010, and several occasions when she had lunch with Crews.  The Court finds Goulet's contention is not supported by the evidence.

Although Goulet testified that she could cite no other incidents of gender discrimination directed at her, in the response brief, her attorneys cite evidence in the record that Crews  expressed his personal opinion that women should be homemakers, an opinion that was based on his religious beliefs.  Crews does not deny that he made that comment or that he held that belief.   However, Goulet does not present evidence to show any causal connection between Crews's openly stated

---

[3]Although Goulet does not separately discuss a Section 1981 claim, she labels her claim of race discrimination as arising under both Title VII and Section 1981.

11

views and the decision to terminate Goulet.  Goulet presents no evidence that Crews made this statement to her or that he made any similar statement when disciplining her or terminating her.

Furthermore, the evidence shows that, of the five Goodwill vice presidents serving with Goulet while Crews was CEO, two were female and three were male.  Goodwill organizational chart, Goulet Ex. 13.   Although the evidence also shows that, after her termination, she was first replaced by Smits, a male, it is also undisputed that a female, Elizabeth Skulski, was later named Vice President of Adult Daycare and Youth Services.   Crews remained the CEO at that time.

This evidence is insufficient to avoid summary judgment.  "'Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer *actually relied* on her gender in making its decision.'" *Ramsey v. City and County of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990) (emphasis added) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (superseded by statute on other grounds)).   Although "stereotyped remarks can certainly be evidence that gender played a part," such remarks, without additional evidence, are insufficient to show pretext.  *Id.*

Goulet offers no additional evidence from which a reasonable jury could conclude that  her gender was a basis for her termination or that Goodwill's reason for terminating her was a mere pretext for gender-based discrimination. Goodwill is entitled to judgment on this claim.

Goulet's claim that her discharge was motivated by race discrimination also lacks evidentiary support.  In support of that claim, Goulet testified that she once overheard Crews telling a joke that involved a reference to a master, a slave, and a rod.  Goulet dep., p. 25, lines 7-24.  She testified that she did not know the context in which this statement was made, and did not hear the entire joke, and acknowledged that the reference to master and slave might have been biblical.   *Id.*

12

Additionally, Goulet testified that, when he first became CEO in 2008, Crews often spoke to African American employees in "black slang" or ebonics, which she found offensive.  *Id.* at p. 26.

She testified she heard him do so, but there is no evidence that he used slang when speaking to her. Furthermore, there is no evidence that these 2008 comments had any connection whatsoever to Crews's decision to terminate Goulet in 2010.

In support of her claims that her discharge was motivated by gender and/or race discrimination, Goulet submits with her response brief affidavits of several Goodwill employees who cite  comments Crews made to them personally and/or statements of their personal belief that he had a  negative attitude toward females and African Americans. *See, e.g.,* Goulet Exs. 9, 10, 11, 25.  Goodwill objects to the consideration of some affidavits because Goulet withheld them from production on grounds of work product.  *See* Goodwill reply Ex. 4.  As a result, Goodwill's counsel did not see these statements prior to the filing of Goulet's response brief, and did not have an opportunity to depose these witnesses.  Counsel contends these affidavits should be deemed inadmissible for summary judgment consideration.

Although the Court is concerned about the assertion of the work product doctrine with regard to these affidavits, the  Court need not address the issue of its propriety under these circumstances because, even if the affidavits are properly considered, they are not sufficient to create a factual dispute that Goodwill's stated reason for terminating Goulet was a mere pretext for either gender or race discrimination.  The affidavits cited by Goodwill, as well as numerous other statements or affidavits she submits[4], do not contain facts showing the affiant's personal knowledge of the reasons

---

[4]Additional affidavits or unsworn statements submitted include Goulet Exs. 27, 38, 48, and 51-54.

13

Goulet was terminated, nor do they reflect personal knowledge of any race or gender based statement or conduct directed at her. Although some specific conversations are cited between the affiant and Crews, they do not involve Goulet or her claims. The perceptions and beliefs expressed by the affiants are not sufficient to create a material factual dispute regarding a causal connection between Goulet's race or gender and *her* termination and are an inadequate basis for avoiding summary judgment. *Harvey Barnett,* 338 F.3d at 1136. Moreover, Goulet offers no evidence that she was present during any of the conversations described by the affiants, and she does not contend that Crews directed such comments to her.

Even if the record is deemed to contain admissible evidence of general gender or racial bias, that evidence does not necessarily give "rise to an inference that all subsequent employment decisions adversely affecting that protected class or someone in it, no matter how unrelated, are also tainted with bias." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1117 (10th Cir. 2007). Instead, "'some nexus between th[e] circumstantial evidence [of general bias] and [the] decision to terminate...' is required." *Id.* at 1117-1118 (quoting *English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1010 (10th Cir.2001)). "This generally requires the plaintiff to show that the alleged general discriminatory animus on the part of the employer played a *direct* role in the adverse employment decision in the plaintiff's case." *Id.* at 1118 (emphasis added). Goulet offers no evidence that any prior expression of gender or racial basis by Crews or any other Goodwill officer or employee played a role in the decision to terminate her.

The Court concludes that Goodwill is entitled to summary judgment on Goulet's claim that her discharge was motivated by discrimination based on her race or her gender.

Title VII sexual harassment/hostile environment claim:

Goulet also contends that she was subjected to sexual harassment creating a hostile work environment.  The Court finds this claim without sufficient evidentiary support to create a material factual dispute.

Title VII's prohibition against gender discrimination extends to protect employees from sexual harassment in the workplace.   To establish that a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.  *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007).

To overcome summary judgment on a hostile environment claim, a plaintiff "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry v. Federal Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir.1998) (citing *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998), *cert. denied*, 526 U.S. 1039 (1999)).  In evaluating a plaintiff's claim, a court looks at all the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Trujillo v. University of Colorado Health Sciences Center*, 157 F.3d 1211, 1214 (10th Cir. 1998)(quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).  Generally, the question is "whether the quantity, frequency, and severity of the

racial, ethnic, or sexist slurs create a work environment so hostile as to discriminate against the minority employee." *Trujillo*, 157 F.3d at 1214.   A plaintiff must not only show she subjectively perceived the environment as hostile or abusive, but that her perception was objectively reasonable. *Davis*, 142 F.3d at 1341.  When reviewing a hostile environment claim on summary judgment, the court must look to the totality of the circumstances, and avoid the temptation to view allegedly discriminatory conduct in isolation. *Penry*, 155 F.3d at 1262.

Goulet does not allege that she was subjected to unwelcome physical or verbal conduct by Crews or other male employees.  Instead, she alleges that she was subjected to sexual harassment based on comments Crews allegedly made to other employees, which she contends created a sexually hostile work environment.

 In support, Goulet cites a comment Crews made, at an unspecified time, in which he asked another employee the name of  someone he referred to as "that fat white woman."  Goulet dep., p. 20, lines 1-5.  According to Goulet, this comment constitutes sexual harassment experienced by Goulet, and she testified that the basis for her belief is "I heard it," and "[t]hat's just the way I perceived it."  *Id.* at lines 6-7, 19.   Goulet's only other cited basis for harassment is a 2009 occurrence.  According to Goulet, she was having lunch with Crews and, when he raised his head after saying grace before eating, he watched an unknown female walk by the table, and "his eyes followed her...until she sat down."  Goulet dep., p. 20, lines 21-25, p. 21, line 1.  She believed this was sexually harassing.

Goulet's other evidence consists of the affidavit of another female Goodwill employee who states that, on one occasion, Crews told her she would not understand measurements of store facilities because she is female.  Goulet Ex. 9.  On other occasions, he stated his belief to the affiant

that a woman's role is to remain in the home with her family, he asked if she had her husband's permission to wear certain clothes, and he allegedly made inappropriate comments because she was taking fertility drugs. *Id.*

There is no evidence that Goulet heard these comments or that Crews ever made such comments to Goulet. Nor does she argue that she was aware of the affiant's concerns or that Goulet raised the issue, filed a grievance, or attempted to take action to support the female affiant.[5]

In the brief opposing summary judgment, Goulet argues that other evidence suggests a gender-based hostile environment. Specifically, in 2009, Smits was disciplined by Crews because he made an improper comment to a subordinate female employee. Goulet Ex. 32. The record reflects that, when the employee mentioned she needed to lose weight, Smits disagreed and said she could be a Playboy or Penthouse centerfold. Smits dep., Goulet Ex. 8, p. 21. Smits admitted making the statement, but added that he did not realize that his remark would be offensive, and he agreed that discipline was appropriate. *Id.,* p. 28-lines 23-25; p. 29, line 1. There is no evidence that Goulet was aware of this incident until some time later, and she offers no evidence from which it could be inferred that this incident had any connection to her.

Goulet also notes that the record reflects a May 2010 incident in which a female employee was said to have reported seeing Donnie Rowe viewing pornography on his office computer. Goulet Ex. 59. The female employee later said she had not made that accusation. *Id.* Nothing about this report evidences any connection to Goulet's claim of a hostile work environment.

---

[5]Some of the other affidavits or unsworn statements express the individual's belief or perception that Crews did not like working with women. As noted, *supra*, whether some of the affidavits are properly considered is questionable. Even if properly considered, the affidavits are insufficient to support a material factual dispute with regard to Goulet's claim that she personally was subjected to sexual harassment creating a hostile work environment which affected the terms or conditions of her employment. None of the statements or affidavits reflect that she was present when the asserted statement was made or that she was aware of it.

The Court finds Goulet's evidence insufficient to permit a reasonable jury to conclude that Goulet was subjected to gender-based comments or conduct which was so pervasive that a reasonable person in her position would find the work environment hostile.   Furthermore, Goulet cites no term or condition of her employment that was adversely affected by the comments cited by other employees.   Accordingly, Goodwill is entitled to summary judgment on this claim.

Title VII religious discrimination:

Goulet also contends that her termination was motivated by religious discrimination in violation of Title VII. Title VII's prohibitions against employment discrimination extend to actions based on an employee's religious beliefs. *See, e.g., Morales v. McKesson Health Solutions, LLC*, 136 F. App'x 115, 117 (10th Cir. 2005) (unpublished) (citing 42 U. S. C. § 2000e-2(a)(1)). "In order to prevail on a Title VII religious-discrimination claim, a plaintiff must show that her employer intentionally discriminated against her by offering proof 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Frick v. Wells Fargo & Co.*, 68 F. App'x 173, 175-76 (10th Cir. 2003) (unpublished) (quoting *EEOC v. Wiltel, Inc.*, 81 F.3d 1508, 1513 (10th Cir.1996) (internal citations omitted)).

 Goulet does not contend that she was terminated because Goodwill failed to accommodate her religious beliefs.   Instead, she alleges that her termination was motivated by religious discrimination because Crews had particular religious beliefs.

According to the Tenth Circuit, "in order to establish a prima facie case in actions where the plaintiff claims that he was discriminated against because he did not share certain religious beliefs held by his supervisors, we hold that the plaintiff must show (1) that he was subjected to some

adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory;  and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs." *Shapolia v. Los Alamos Nat. Laboratory,* 992 F.2d 1033, 1037 (10th Cir. 1993).   If the plaintiff presents such evidence, the burden shifts to her employer to present a non-discriminatory reason for the termination.  If the employer presents such a reason, the plaintiff must then come forward with evidence to show that the proffered reason is a mere pretext for religious discrimination.  *Id.*

The record reflects that Goulet has failed to present evidence sufficient to show that she was subjected to religious discrimination.  The record reflects that Crews admittedly held fundamentalist religious views, as explained in  his deposition testimony.  Goulet relies on this testimony and evidence that Crews made comments suggesting women should not work outside the home, a statement she attributes to his religious beliefs.  Crews does not deny making such statements.

However, Goulet cites no evidence that Crews's religious beliefs had any causal connection to her termination.  She presents no evidence that Crews mentioned religious beliefs when he terminated her.  Goulet presents no evidence that she ever  expressed disagreement with Crews's religious beliefs during her employment or that religion was a subject of any disciplinary action imposed against her.   In fact, Goulet does not explain her own religious beliefs, and cites no evidence that she ever discussed her beliefs with Crews.  There is simply no evidence from which it could be reasonably inferred that Goulet was terminated because of a conflict between her religious beliefs and the beliefs of Crews.   The Court concludes that Goulet has failed to present evidence sufficient to support a *prima facie* case of religious discrimination.

Even if she satisfied her *prima facie* burden, the evidence is insufficient to permit a reasonable jury to conclude the stated reason for Goulet's termination was a mere pretext for religious discrimination.  The record is void of any evidence that, during the approximately two years in which Crews served as Goulet's supervisor, he initiated any adverse action against her that had any connection to the religious beliefs of either Goulet or Crews.      Goodwill is entitled to judgment on Goulet's claim of religious discrimination, and its motion is granted as to that claim.

ADEA claim:

Goulet also contends that her termination was motivated by discrimination based on her age, noting that she was approximately 57 years old at the time of her termination.  Although she concedes that she was initially replaced by Ken Smits, who was approximately 60 years old at the time,  her position was ultimately filled by Skulski in January of 2011, when Skulski was 44 years old.[6]

To establish a *prima facie* case that her termination violated the ADEA, a plaintiff must plead and prove that 1) she was a member of the protected class of individuals age 40 or older; 2) she was performing satisfactory work at the time; 3) her employment was terminated; and 4) she was replaced by a younger person, although not necessarily one less than 40 years of age.  *Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008).

"The ADEA, like other anti-discrimination statutes, includes a causation requirement." *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010).   "It prohibits employers from discriminating against any individuals with respect to employment "*because* of such individual's age." *Id.* (emphasis in original).   "'[T]he ordinary meaning of the ADEA's requirement

---

[6]In her deposition, Skulski testified she was born in 1967.   Skulski dep., Goulet Ex. 22, p. 5, lines 11-13.

that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act.'" *Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (quoting *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 176 (2009)).  Thus, the plaintiff must show that age was the "but-for" cause of the adverse employment decision.  *Gross*, 557 U.S. at 180.

The Tenth Circuit applies the *McDonnell Douglas* burden-shifting analysis to ADEA claims.  *See, e.g., Jones*, 617 F.3d at 178.  Thus, the plaintiff must first establish a *prima facie* case, the defendant must then present a justifiable business reason for its action and, if so, the plaintiff must present evidence sufficient to allow a reasonable jury to conclude that the justifiable reason is pretextual, and the true reason for the termination is age discrimination.  *Id.*

In this case, assuming that Goulet has presented sufficient evidence to support her *prima facie* case, the evidence on which she relies is insufficient to create a material fact dispute regarding pretext.  Moreover, she offers no evidence from which a jury could conclude that, but for her age, she would not have been terminated.

Goulet's evidence of age discrimination consists of a 2009 comment by Crews.  According to Goulet, she mentioned a new employee to Crews and, in response, he asked if she was referring to "the young blonde."  Goulet dep., p. 15, lines 23-25; p. 16, lines 1-7.  Although Goulet agrees this occurred more than one year before her termination, she cites this statement as evidence of age discrimination.

This and other comments by Crews[7] are insufficient, as "'stray remarks'" and "'isolated or ambiguous comments are too abstract...to support a finding of age discrimination.'"  *Wagoner v.*

---

[7]As discussed, *supra*, Goulet has submitted affidavits and statements from other Goodwill employees who are in the protected age group.  Even if these are properly considered, they do not reflect comments about Goulet's age, nor do they create an inference that her termination was motivated by age.

*Pfizer, Inc.*, 391 F.App'x 701, 708 (10th Cir. 2010) (unpublished) (quoting *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994)).  Furthermore, "the passage of time can also render a comment too remote to support a finding of pretext."  *Id.* (citing *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) (comment made nine months before termination was too remote)).

Crews's alleged 2009 reference to an employee as a "young blonde" does not support a contention that he terminated Goulet or otherwise discriminated against her on the basis of Goulet's age.  She offers no evidence of comments by Crews or anyone else referencing *her* age, and there is no other evidence of record that could arguably support  even an inference that, but for her age, she would not have been terminated.  Even if the evidence is deemed sufficient to satisfy her *prima facie* burden, it is insufficient to create a factual dispute from which a reasonable jury could determine Goodwill's reason for her termination was a mere pretext for discrimination.  Goodwill is entitled to summary judgment on Goulet's ADEA claim.

42 U.S.C. § 1985(2) retaliation claim:

In addition to joining in the Title VII and ADEA retaliation claims asserted by the EEOC, Goulet alleges a separate claim that Goodwill violated 42 U. S. C. § 1985(2) by conspiring to retaliate against her for testifying on behalf of the plaintiff in the Ford lawsuit.  Goulet argues in her response that Goodwill did not expressly seek judgment on this claim.  However, Goodwill notes that the claim is addressed in connection with its argument seeking judgment on all retaliation claims asserted by both the EEOC and Goulet.

Although the retaliation claims under Title VII and the ADEA are addressed separately herein, as Goodwill points out, a § 1985(2) claim of retaliation, unlike Title VII and the ADEA,

requires that the plaintiff prove "a conspiracy of two or more persons" to retaliate against an individual for testifying in federal court.  42 U. S. C. § 1985(2).  According to her own contentions, Goulet asserts that Goforth, Crews, and Goodwill's outside counsel conspired to retaliate against Goulet for offering deposition testimony in the Ford lawsuit.  *See* Goulet brief at p. 24.

Goulet's contention cannot support a § 1985(2) claim based on a conspiracy to retaliate. "The existence of a conspiracy is an essential element of a cause of action under both subsections 2 and 3 of § 1985."  *Hinsdale v. City of Liberal,* 19 F. App'x 749, 770 (10th Cir. 2001) (unpublished) (citing *Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1230 (10th Cir. 1990)).  A conspiracy requires actions in concert by two or more persons, and a corporation is "an inanimate entity" which must act through its agents.  *In re Foster*, 188 F.3d 1259, 1265 (10th Cir. 1999) (citations omitted). With respect to a § 1985(2) conspiracy to retaliate claim, discussions between "corporate employees or officers and their outside counsel are not 'conspiracies' under this law."  *Shu v. Core Industries, Inc.,* 1999 WL 33589276, at *4 (E.D.N.C. Feb. 10, 1999) (unpublished) (citing *Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108, 110  (7th Cir. 1990), *cert. denied,* 502 U.S. 812 (1991)).

In this case, Goulet's express allegations are insufficient to establish a conspiracy to retaliate against her in violation of § 1985(2), and Goodwill is entitled to judgment on that claim.  Whether judgment for Goodwill or the EEOC may be granted on the Title VII and ADEA retaliation claims presents a different issue, as those claims are not dependent on the existence of a conspiracy.

State tort claims:

The Court concludes that, for the reasons set forth in connection with Goulet's Title VII and ADEA claims of discrimination, her state law discrimination claims under the OADA also fail, as

there is insufficient evidence to create material factual disputes on which a jury could find in her favor on those claims.   Inasmuch as her state claim that her termination violated public policy also rests on these same allegations, it must also fail.   Finally, with respect to her alleged claim of negligence, she has failed to articulate a basis for that claim that would render it cognizable under Oklahoma law.   Goodwill is entitled to judgment on these claims.

<u>Title VII and ADEA retaliation claims:</u>

The EEOC contends that Goodwill violated both Title VII and the ADEA by terminating Goulet in retaliation for her exercise of rights protected under those statutes.   Specifically, it contends that she was terminated because she offered deposition testimony in support of the claims of Francy Ford, who alleged that Goodwill discriminated against her on the basis of gender in violation of Title VII and on the basis of age in violation of the ADEA.

Title VII prohibits an employer from retaliating against an employee for making a claim of discrimination or otherwise opposing discrimination. *See* 42 U.S.C. § 2000e–3(a). To prevail on a Title VII retaliation claim, a plaintiff must show "that retaliation played a part in the employment decision...." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir.2008).

To satisfy her *prima facie* burden on her claim of retaliation prohibited by Title VII, Plaintiff must show that 1) she engaged in protected opposition to discrimination; 2) her employer subsequently took action that a reasonable employee would have found materially adverse; and 3) there is a causal connection between her protected activity and the adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006); *Argo v. Blue Cross and Blue Shield of Kansas*, 452 F.3d 1193, 1202 (10th Cir. 2006).

The ADEA contains the same prohibition against retaliation for the exercise of rights it

protects. "The ADEA's anti-retaliation provision forbids an employer from discriminating against an employee because she 'has opposed any practice made unlawful' by the statute, or because she 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation' under the statute." *Dirusso v. Aspen School Dist. No. 1* , 123 F.App'x. 826, 837 (10th Cir. 2004) (unpublished) (quoting 29 U.S.C. § 623(d)). To establish a *prima facie* case of ADEA retaliation, a plaintiff must show (1) she engaged in protected activity; (2) she suffered adverse action at the employer's hands either after, or contemporaneously with, her protected activity; and (3) a causal connection exists between her protected activity and the adverse action. *Corneveaux v. CUNA Mut. Ins. Group*, 76 F.3d 1498, 1507 (10th Cir.1996).

The Supreme Court's recent decision in *University of Texas Southwest Medical Center v. Nassar*, 570 _ U.S. _, 133 S.Ct. 2517 (2013) altered the plaintiff's burden in a Title VII retaliation action. In *Nassar*, the Supreme Court held that the standard for causation under a Title VII retaliation case is the "but-for" standard of traditional tort law, not the "motivating factor" standard used in Title VII discrimination claims. *Nassar*, 133 S.Ct. at 2533. "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

In this case, both the EEOC and Goodwill contend that the undisputed material facts in the record entitle them to judgment on the retaliation claims. The EEOC contends that the evidence supports its claim that, but for Goulet's testimony in support of Francy Ford's Title VII and ADEA claims, Goodwill would not have terminated her employment. Goodwill contends that the undisputed facts show it had a justifiable business reason for terminating her and that reason was unrelated to her deposition testimony.

The Court finds that disputed material facts preclude summary judgment for either the EEOC or Goodwill.   The Court cannot conclude that the undisputed evidence shows Goodwill's decision would have been made even if Goulet had not offered the deposition testimony, given the fact that it did not know about her allegations of racism and sexism until she offered that testimony. Although there is evidence to suggest that her statements in the deposition may have independently been reported to Crews, the Court finds that this determination must be left to the jury.   Additionally, the testimony of several witnesses may be subject to credibility assessments, and such assessments cannot properly be made at the summary judgment stage.   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000) (citations omitted).   The Court concludes that the claims of retaliation for the exercise of Title VII and/or ADEA rights must be reserved for the trial of this case.

Conclusion:

For the foregoing reasons, the EEOC's motion for partial summary judgment [Doc. No. 58] on the Title VII and ADEA retaliation claims is DENIED.   Goodwill's motion [Doc. No. 59] is DENIED to the extent it seeks judgment on the Title VII and ADEA retaliation claims asserted by the EEOC and Goulet.   Goodwill's motion is GRANTED as to all other claims asserted by Goulet. The action will proceed only on the Title VII and ADEA retaliation claims.

IT IS SO ORDERED this 30th day of September, 2013.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE